RICHARD HADEN HOOD, appellant,

*v.*

FRANCES SPARKS HOOD, respondent.

[Argued June 19th, 1914. Decided October 2d, 1914.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevens, who filed the following opinion:

This is a suit between husband and wife brought by the husband to recover a house and lot in Plainfield standing in his wife's name. He contends that a trust resulted to him because he paid the purchase-money and because at the time of the conveyance, his wife, as he says, agreed to convey the property to him whenever he wished.

The allegations of the bill have, in this case, some significance and should be considered in connection with the proved facts. After stating that the real estate broker had in his wife's presence suggested that the title be taken in her name, the bill proceeds:

"Inasmuch as your orator was at that time on unfriendly terms with his heirs-at-law, who were his brothers and sisters. and inasmuch as at that time, he had executed no will, he was favorably inclined to this suggestion, but stated that being a business man, he disliked the idea of putting any of his assets in his wife's name. Thereupon your orator's wife, who had been present during the entire transaction and conversations referred to, stated that if the title were placed in her name, she would convey the same to your orator at any time he so desired."

Of the allegation up to this point. the complainant had produced some proof on his side. Then the bill continues:

"Thereupon without any intention of making a settlement of the property in question upon his said wife, *who at the time expressly disclaimed such purpose in the transaction,* your orator caused the deed for the said lands and premises to be made to his said wife as grantee."

There is no proof of any such *express* disclaimer and no proof of *any* disclaimer, except in so far as it may be inferred from her alleged promise to convey. The wife answers that the property was conveyed to her by way of settlement.

The parties were married in July, 1901. They traveled abroad a great deal; lived in New York City, and for two or three seasons prior to 1908 rented a house in Plainfield. They seemed at times to have been happy together and at times to have quarreled and temporarily to have separated. Aside from such occasional separations they lived together until September, 1912.

In the winter of 1908, Mr. Hood was in Europe alone. He wrote to his wife to look for a home. She went to Plainfield, and, among other properties, saw that now in dispute. On the day after Hood's return, in April, 1908, they went to Plainfield and liked the property in dispute so well that he made an offer. After some bargaining, the owner agreed to take $31,000. To arrange details and consummate the transaction they met in the office of Mr. Lyman, a real estate broker in Plainfield. After the amount of money Mr. Hood was to pay and other details were adjusted, the broker asked in whose name the deed was to be taken. As the case turned largely upon the conversation that then took place, I give it in the words of the witnesses.

Mr. Lyman, the broker, called by complainant, says:

"I said to Mr. Hood, I said 'Well now, Mr. Hood, what about this title,' and he said, 'Well Lyman, what about that.' I said 'Why don't you take this title in Mrs. Hood's name.' 'Well,' he said, 'What does that mean.' I said, 'It don't mean anything particularly; I think everything is all right and it is done very frequently,' and he remarked that he didn't think it was a proper thing for a business man to do.   *   *   *   So we talked in reference to that for two or three minutes   *   *   *   and then Mrs. Hood said, 'Well Haden, what difference does it make, you can have it back at any time you want it.' That followed a conversation in reference to my saying that I had known of a case where it meant a good deal to the husband to have the property in his wife's name."

What he (Lyman) did say in reference to this case was further brought out on cross-examination:

"Well, I said, it is done very frequently; in fact, it is rather an unusual occurrence to be otherwise, as far as I can figure it out in my business. * * * I did not feel that I was doing wrong in making the suggestion to put the property in his wife's name, and when he talked about these other things, I remarked, as I remember it, that, of course, it doesn't mean that it is absolute; that you have to sign the deed anyhow in case the property is sold and then is when [hiatus]. * * * I simply said, well I knew of a case where it came in pretty handy.

"Q. Pretty handy in the sense that a man had failed and had managed to save some of his property, because it had been in his wife's name?

"A. Yes, he was able to borrow some money; he failed for three millions and afterwards paid it back at six per cent. interest. * * *

"Q. The only reason you had to refer to this instance was that (that they were at him pretty hard and heavy); wasn't it?

"A. That is all.

"Q. That is the advisability of having the property in his wife's name, so that if he were to fail in business, there would be something left?

"A. I thought that was an argument.

"Q. Did you tell him so?

"A. Oh, no; I simply said I know of a case where such a thing as that made a great difference to a man—that was all that I said."

Mr. Hood's version of the interview does not, substantially, differ. He says:

"Mr. Lyman said to me in words, if not in substance, and I think in words, * * * 'Why not put the deed in your wife's name,' and he said Mr. So and So's (mentioning a name) property had been saved in that way and that he had been able to borrow money and get on his feet and pay off his obligations, and I shook my head and said, 'I don't like the idea of a business man putting his assets out of his hands and in his wife's name,' and Mr. Lyman then explained the matter more fully as I remember it, and Mrs. Hood turned to me and said, 'Haden, that won't make any difference, you can have it back whenever you want it,' and I said to Mr. Lyman, 'Go ahead.'"

Mrs. Hood's version is:

"Mr. Hood said he had decided to put the place in my name, to deed it to me. Mr. Lyman said, 'I am very glad; Mrs. Hood has wanted a home for so long and I am very glad to see it given to her.' And he said it is a very good idea too Hood, for business reasons. He said, now there is a broker here in town (and he mentioned his name) who failed, I think for a million and a half a year or two ago, and he said, the only thing he had that he could put his hands on was the property in his wife's name, and now he has made up the losses and is on his feet again. and Mr. Hood turned to me and he said, 'If we were ever

in a hole Frank, the place goes too.' He was such a moralist, don't you know, before this man Lyman; and I said certainly; and the only way I remember that conversation is that Lyman looked very much embarrased that he had suggested such a thing."

These were all the witnesses who testified on this point. Mr. Van Wyck, who was present, at least some of the time, does not recall this part of the conversation.

The rule to be applied in a case of this kind has been so frequently stated in our court of last resort that I need do no more than refer to one of its latest utterances. Says Mr. Justice Bergen, in *McGee* v. *McGee, 81 N. J. Eq. 194:* "The rule in this state is well settled that where a husband procures real estate to be conveyed to his wife, he paying the consideration, a presumption arises that he intends to settle the property on her, and while such presumption may be rebutted, the proof offered to accomplish it must be certain, definite, reliable and convincing, leaving no reasonable doubt of the intention of the parties."

Does the evidence offered in complainant's behalf come up to this standard?

If a man puts property in his wife's name, we naturally look for his reason or motive. The reason mentioned in the passage above quoted from the bill of complaint is that Mr. Hood was on unfriendly terms with his heirs-at-law and that he had executed no will. If this were the real motive he must, in order to have given substantial effect to it, have conferred upon his wife more than the bare legal title. If, on the other hand, he was inspired by a desire, in a time of prosperity, to lay up something for his family against a time of business adversity, then, too, he must have intended to bestow something more than a bare legal fee, unless we yield to the suggestion, repudiated by Hood himself, that the conveyance was made only with an intent to hinder and delay future creditors, in which case the observations of Mr. Justice Swayze, in *Beck* v. *Beck, 78 N. J. Eq.* (on *p. 547*), would apply.

While the husband's and Lyman's version of the meeting seem at first blush to differ considerably from that of the wife's, when we come to analyze them, the difference is not as great as it seems. All give prominence to the fact that Lyman suggested a

conveyance to the wife because of its usefulness in the event of a business reverse and all agree that Hood's direction to make the conveyance followed immediately upon Lyman's suggestion and had reference thereto. They differ in that, Mrs. Hood testifies that it was she who first mentioned the fact of an intended gift, and they differ also in that Hood's version of what she said, "You can have it back whenever you want it," is apparently broader than her version—broad enough to include any and all happenings at any and all times, while hers, "certainly," in answer to his remark, "if we are ever in a hole, the place goes, too," is restricted to the contingency that had just been mentioned by Lyman. The parties are attempting to reproduce what was said five years before, in a case where a slight change in the form of the expression might greatly change the meaning. It may well be that, general as they are in form, Mrs. Hood's words, taking them as they are recalled by Hood and Lyman, had reference only to the contingency that had just been mentioned, and not to other events and possibilities not then considered. At all events, I do not think we have here that certain, definite and convincing proof which should divest the apparent owner of her equitable title. Whether we regard the motive alleged in the bill, or the motive mentioned in the course of the conversation, as it is recalled by Hood and Lyman, we must, as I have said, to give it effect, suppose it to have been the intention to vest in Mrs. Hood something more than the bare legal fee. If this be so, the evidence, so far from overcoming the presumption of an advancement, rather negatives an intention to create a trust that would vest the entire beneficial interest in Mr. Hood.

But it is said that Mrs. Hood has recognized her husband's ownership by the expressions "your house," "your place," to be found in her letters. The words "my, our, your house," in the correspondence of a husband and wife, are ordinarily intended to denote the object and not its ownership and are of little value in determining a question of title. Notwithstanding modern legislation, husband and wife still imagine that the passage in the marriage service, "with all my worldly goods I thee endow," does have some meaning. If, in this case, the words are evidence

against Mrs. Hood, then the similar words in Mr. Hood's letter of October 3d, 1911, are evidence in her favor. In that letter he writes:

"I married you wishing to make you a good husband; that same good intention prompted these enclosed letters and culminated in my giving a full half of all my savings (hoardings would be nearer to it) of a whole life and three years of that life in building *your* home."

It is quite impossible to decide the case upon a consideration of any such expressions. If the *written* words are of little value, of still less are the similar verbal utterances testified to by Mr. Hood and denied by Mrs. Hood.

There is some evidence in this case which deserves a more careful scrutiny. Mrs. Hood says that her husband had, from the time he married her, promised to give her a home. This Mr. Hood denies. Mrs. Hood's evidence is, however, corroborated, to some extent, by her mother's, Mrs. Sparks, who says that when Mr. Hood received a cable from her husband approving their engagement, he brought it to her and said: "I am going to give Frances a home between New York and Philadelphia, that she will be near you," and that ten years later, while on a visit to her daughter, Mr. Hood said to her: "I have made Frances no anniversary gift. I have given her this home and all these beautiful things, and I don't have to give her anniversary gifts."

A gift of the house would not seem to have been out of proportion to Mr. Hood's resources, as he himself depicts them. In his letter of September 7th, 1911, writing to Mr. Sparks, his father-in-law, he says:

"In January, 1908, we agreed to separate, but Frances wrote me at Nice that she ought to have had a home, and that things would go differently. * * * I bought the one she selected. * * * I have spent $350,000 since our marriage, and Frances has shared a big half of it until now.

The deed was made within two weeks of his return from Europe. As the letter I have just quoted from shows the parties had become reconciled. . Mr. Lyman says, speaking of this period, they seemed "always very devoted to each other." The

letter written from the Hotel Plaza on August 17th, of the same year, is further evidence of this. Mr. Hood therein says:

"I miss you. You certainly deserve a sweet home for such sweet constant devotion to this old bear of a husband; perhaps I do not fully appreciate what a real jewel you are; God bless you."

He was, at that time, in the mood to be generous, and he had the means to make a gift. Not until the very serious quarrel, which occurred in the autumn of 1911, did he ask to have the property back. What then occurred deserves consideration.

Mrs. Hood says that on September 5th, 1911, Mr. Hood told her to leave, and she said she wouldn't unless he put it in writing, and thereupon he wrote the note of that date, put in evidence. Mr. Hood says they separated by agreement. She went to New York. Then some correspondence took place between Mr. Hood, on the one hand, and Mrs. Hood and her father's counsel, whom she had then consulted for the first time, on the other, and some things were done which are inexplicable unless we suppose that they had had some previous understanding, more or less vague, perhaps, in reference to the ownership of the property. Having no children, it may have been their idea, if we may judge from what then took place, that the house should then go to Mrs. Hood if she survived him and to Mr. Hood if he survived her. This is mere conjecture. On September 23d, Mr. Hood wrote to Mr. Shipley, his wife's counsel, as follows:

"The house at Plainfield and over ninety-five per cent. of the contents were paid for by me, and only placed in Mrs. Hood's name under an agreement with me that the place was mine and only put in her name *to safeguard her in case of my death.*"

Considerable weight must be given to this passage. It was written two years ago to one who stood in a position of antagonism to him, ready, as he must have known, to take advantage of his admissions. It militates against Mr. Hood's present position that his wife was to have no beneficial interest. It indicates that Hood's idea at that time was that it would be hers, beneficially, if he died before her.

He followed up this letter by one of September 30th to his wife. He says:

"I enclose herewith for your signature deed to me for the property here; kindly execute this before a commissioner, &c. * * * This is in accordance with the promise you have always made me."

What promise did he refer to? Certainly not to an agreement on her part to hold the bare legal title in trust for him, for he had only five days before made a contrary statement to her lawyer. He drew this deed himself and he drew it direct from his wife to himself. Evidently he had not consulted counsel, for counsel would have told him that he could not acquire title in that way. Mrs. Hood says she received the letter "out of a clear sky." She says further that she went to Philadelphia and showed the deed to Mr. Shipley. Mr. Shipley was then in communication with Hood, trying to make an arrangement for separation and support—a guaranteed arrangement as she called it. Mr. Shipley told her, she says, that it was all right for her to return the property if her husband would consummate the arrangement proposed. But she did not wait for its consummation; she sent it to him in a letter (not produced because destroyed) telling him that she was returning it in view of the confidence she had in him that he would do the right thing as he had said. He acknowledged its receipt on October 5th, and enclosed her a check for $1,545, the cost of some silver she had bought. Then she says she waited for two weeks in the expectation that he would consummate the arrangement, and not hearing from him, again wrote taking him to task for his silence. To this letter he replied as follows:

"I do not like the insinuations in your letter of the 17th inst. If you will return me the $1,545, I will send you your silver *and return you the deed*, otherwise drop the matter."

On October 20th she wrote:

"I enclose you my check for $1,545, and according to your letter of October 19th, please return to me at once the deed which I executed at your request. I wish the silver and all my possessions to remain at 541 Stelle avenue (the property in dispute), as I have but one home and

that is in Plainfield, New Jersey. * * * *Enclosed is my will which I have made to safeguard you in the event of my death.*"

By this she attempts to devise all her estate, real, personal and mixed, to her husband. He returned the deed, but not the will, in a registered envelope without any accompanying letter. Shortly after, he wrote that he was going abroad. He did, in fact, go to India, and Mrs. Hood went to Italy. No settlement had been arrived at. In the following winter they met in Paris and became reconciled. On their return to this country they went to Plainfield and lived there until September, 1912. What happened during the spring and summer of that year is told in my opinion in the divorce case. There is nothing during that time that throws further light upon the subject here considered.

We have then this peculiar situation: The parties fail to testify to any agreement which would give to both an interest in the property, and yet each appears to admit, at a time when they are at swords' points, that the other had some claim thereto, legal or moral. Why otherwise, with what seems to be punctilious honor, would the husband return to his wife the deed canceled by himself and the wife make a will in *his* favor? The suggestion of counsel that the deed was returned because Mr. Hood had discovered its invalidity does not accord with the sequence of events or with the correspondence. The evidence of Mr. Rohrer, to the effect that while the negotiations were pending, Mrs. Hood stated to him that she had executed it because she was "going to be as good as her word," does not, in view of the facts detailed, necessarily imply that she has executed it because she knew that she had no equitable interest. His advise to her that now she had it back, she should not let it go again, rather indicates the contrary.

If complainant had founded his case upon a promise by his wife to convey to him a fee in remainder contingent upon her dying before him, the case would have more nearly resembled *Duvale* v. *Duvale, 56 N. J. Eq. 375;* but he has made no such case. If he had, he would have been greatly embarrassed in proving a contract valid under the statute of frauds. Assuming a verbal understanding, such as I have suggested, the question would have been, when was such understanding had? Certainly not, if

we are to give credit to Mr. Hood's testimony, at Mr. Lyman's office, when the name of the grantee was decided upon. It must have been then, either before or after the meeting there. Considering how very soon after Mr. Hood's return from Europe the transaction was consummated, and considering further the utter lack of any reference to it in Lyman's office by any of the witnesses, it is more reasonable to conjecture that if it existed at all, it was had subsequently; but if subsequently, then it is unenforceable because not in writing. It stands, at best, as no more than what might be termed a working hypothesis, resorted to only to explain the conduct of the parties. The case, in this aspect of it, has some resemblance to *Midmer* v. *Midmer's Executors, 26 N. J. Eq. 300; 27 N. J. Eq. 548.*

There are two tracts in controversy, the Van Wyck and the Chapman tracts, the latter of which was purchased two or three days after the former, for the purpose of extending the grounds. My discussion has hitherto related to the Van Wyck tract. I cannot find in the evidence any good ground for coming to an opposite conclusion in reference to the Chapman tract. The evidence of a resulting trust is to be found only in the assertions and evidence of Mr. Hood denied by his wife. The two tracts have always been used and treated as one, and in no part of the correspondence are they put upon a different footing. It being necessary to overcome the presumption of an advancement by evidence "certain, definite and convincing," I cannot say that such evidence has been produced.

Mr. Hood spent, he says, between fifty and sixty thousand dollars in improving the property. The improvements follow the title. *Selover* v. *Selover, 62 N. J. Eq. 761.*

I attach little importance to the fact that Mr. Hood received one-quarter's rent after his purchase; that he paid the taxes and that he took charge of the deeds, kept, it would seem, for considerable part of the time at least, in a box standing in their joint names. These were acts that would probably have been done in any event by a husband situated as he was. His wife had little, if any, independent income. I think the bill should be dismissed.

*Messrs. McCarter & English,* for the respondent.

*Messrs. Collins & Corbin,* for the appellant.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Stevens.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, BOGERT, VREDENBURGH, HEPPENHEIMER, WILLIAMS—12.

*For reversal*—None.